Filed 8/4/22  In re A.M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | B316350 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP02631A |
| Plaintiff and Respondent, | |
| v. | |
| R.D. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant R.D.

Caitlin Christian, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————

A father and mother appeal the juvenile court's order terminating their parental rights over their young daughter. We affirm. Undesignated statutory references are to the Welfare and Institutions Code.

I

In April 2019, when the child was five months old, the Los Angeles County Department of Children and Family Services filed a petition alleging the child was at risk of harm in her parents' care due to their unresolved mental and emotional problems. The mother had faced similar allegations in an earlier dependency case and had lost parental rights to her older daughter in 2011.

Someone in the child's pediatrician's office made the child welfare referral. The office was concerned the child may have serious medical conditions (including spina bifida and cerebral palsy) but the mother was in denial, was not following up on medical referrals, and was not feeding and caring for the child properly.

The parents initially refused to bring the child to be detained. Eventually, the Department placed the child with foster mother T.N. after two other foster placements fell through.

The juvenile court ordered monitored visitation and sustained the petition. The court later ordered reunification services for the father but not the mother.

Visitation was generally twice a week. This changed briefly to daily video and phone visits at the outset of the COVID-

2

19 pandemic, but in-person visits resumed in early June 2020. Generally, during these visits, the father was more affectionate and attentive to the child than the mother, who appeared more interested in photographing and recording the child and who would bring items that were choking hazards. One report noted the child responded to the father with cooing and smiled often. Several reports noted the father deferred to and depended on the mother during these visits.

In February 2020, an "Early Intervention Infant Teacher" reported the relationship between the child and her parents was "very loving" but concluded the parents lacked the skills and competence to parent properly and were unreceptive to support and even combative.

The child received Regional Center services, including physical therapy and occupational therapy. She had multiple developmental delays, including in the area of communication. At 16 months, she had a developmental age of 9 months.

The mother and father completed psychological evaluations. The evaluator concluded the mother had a psychotic disorder. The father's symptoms were consistent with bipolar disorder, and he presented with cognitive delay and limited insight. Before this evaluation, the father had been diagnosed with schizophrenia and depression, and he had been hospitalized. Both parents had a poor prognosis for independent and safe parenting without mental health intervention.

The father attended therapy for a while but then stopped. Both parents had refused to take medication. The parents also declined neurological testing and blood tests to rule out certain causes for their daughter's developmental delays. They were in denial regarding her delays.

By October 2020, the Department was recommending termination of the father's reunification services. Although he generally was compliant with his case plan, the Department was concerned about his lack of insight, his lack of boundaries and "co-dependency" with the mother, his lack of protective capacity, and his inability to care for the child independently. The parents did not intend to separate, and the father opposed separate visits. The child's counsel felt the father was choosing the mother over the child. At a combined review hearing, the juvenile court found it would be dangerous to return the child to parental custody and terminated services.

The Department recommended adoption by the family that had adopted the child's older sister. This family lived in Nevada. The recommendation upset the parents, and they urged adoption by the foster mother so the child could remain close and they could continue visiting her.

Ahead of the section 366.26 hearing, a social worker reported the child was making strides developmentally and "tries to speak all the time." The Department also reported on multiple occasions that, while the child was "well loved" by her parents, she "does not show any significant attachment to her parents outside of them being people she is brought to interact with" twice a week or weekly.

The court continued the section 366.26 hearing while the child transitioned to Nevada to live with the potential adoptive family. A last minute information showed the transition had been smooth; the child was integrating positively with this family and had "quickly grown attached to her two adoptive big sisters."

In November 2021, the juvenile court held the section 366.26 hearing to select and implement a permanent plan. The

father testified briefly at the hearing.  He described the frequency and circumstances of his visits with his daughter and then described what typically happened during these visits:

"We would try to play some soccer, learn about shapes, how to put shapes away, kind of figure that—what type of toys that we would have, that she didn't really want to play with us, so we would just kind of go over some Peppa Pig books, try to read her some English phonics, and then try to play on the kids gym, right, the slide and kind of watch her go up and around.

"And she enjoyed that very much.  She was very good at it.  Yeah, we would also try to paint, construction paper or coloring books.  We would kind of hang out, play with her, understanding how she likes to color, hopefully that she would be able to speak about it, to let us know how she finds anything.

"We were learning for the beginning of English or letters, and coloring books, what can she know about, photos, so she can keep it in the line, or if not, she's going to try her best to just scribble.  She found it very fun."

The father talked about the occupational therapist's work with the child and answered some questions by the court and the mother's counsel.  He said he needed the mother at the visits so they could "kind of learn about each other" and bond with their daughter.

The mother did not testify but appeared to say things to the father during his testimony.  The court warned she needed to stop telling him what to say.

The father's counsel argued the parental-benefit exception to adoption applied and the father "stands in the role of a parent to the best of his abilities."  The mother's counsel argued the mother too "has played a parental role."  In response, the child's

counsel argued, "I think Father's testimony was very clear that what they are to my client is basically a playmate" and that "there were times where my client didn't even want to play with them." This lawyer also emphasized the child's young age and the short time she had lived with her parents. Both the child's counsel and the Department noted the parents had not progressed beyond monitored visitation and requested the court terminate parental rights.

The juvenile court considered the entire contents of the court file and specifically noted the section 366.26 report dated March 4, 2021. It found the child to be adoptable. Regarding the parental-benefit exception, the court found the parents had maintained regular and consistent visitation and contact. But it also found the parents "ha[d] not established a bond with the child[,]" it would not be detrimental to the child to sever the relationship, and the benefits of adoption outweighed any benefit of their relationship. The court remarked that, to some extent, the consistent visitation "has confirmed a parental role and relationship. [¶] They at times have worked with the occupational therapist, and the occupational therapist has been there. In addition, the parents have participated in some developmental activities of the child. [¶] But at the same time, these visits have been a couple hours once or twice a week monitored. And even with there being some developmental and parental aspects to it, in large part, it has also really been a playmate and that type of relationship."

The court terminated parental rights and chose adoption as the permanent plan.

The father appealed and asks us to remand the matter for the juvenile court to "reconsider the evidence presented at the

6

section 366.26 hearing under the correct legal standards" of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The mother also appealed and joined in the father's brief. She independently contends if we reverse the order terminating the father's parental rights, we must reverse as to her rights too. We therefore consider the father's arguments.

## II

The father argues the juvenile court erred in finding the parental-benefit exception did not apply because it considered an improper factor (whether the parents had a parental role), failed to conduct a proper analysis focused on the family's bond from the child's perspective, and based its decision on an inadequate record. None of these contentions has merit.

## A

We survey the law.

At the permanency planning hearing, the focus is on the best interests of the child, and the default option is adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.) Only in exceptional circumstances, laid out in the statute, is it appropriate for the juvenile court to select a different plan. (*Id.* at pp. 630–631.)

The parents invoked the parental-benefit exception, section 366.26, subd. (c)(1)(B)(i). This limited exception recognizes that, despite the child being outside the parents' custody, their bond might be so strong that the harm to the child from severing it outweighs the benefits of adoption. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 631, 633–634.) For this exception, parents must establish: (1) they visited the child regularly; (2) there is a "substantial, positive, emotional attachment" between them and the child; and (3) terminating this attachment would be detrimental to the child. (*Id.* at p. 636; see also *id.* at p. 631.)

7

We review the juvenile court's findings on the first two prongs for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) The third prong requires determining whether any harm the child would suffer from losing the parental bond would outweigh the benefits of adoption. (*Id*. at p. 640.) The juvenile court must undertake a careful inquiry to untangle the burdens and benefits of the proposed action. (*Id*. at pp. 633–634.) We review this determination for an abuse of discretion. (*Id*. at p. 640.) In sum, our review is deferential.

B

We reject the father's claim the Department's reporting was inadequate.

The child was under three years old and could not make a meaningful statement during the entire period of reporting due to her age and communication delays. Nevertheless, the section 366.26 report (and others) appropriately described the parent-child interactions and discussed "the amount of and nature of" the parents' contact with the child. (§ 366.22, subd. (c)(1)(B).)

The report incorporated information from earlier reports, including the infant teacher's February 2020 comment about the parents' "very loving" relationship with their child. It noted the parents' visitation had been consistent, twice a week at a local park, and monitored by the child's foster parent, a social worker, and the infant teacher. The visits were about an hour each. The report described the visits: how the parents would bring many items, some of which were age-inappropriate, and the child would show "limited to no interest" in most of the items; how the mother would treat her daughter more like a doll than a child and was focused on changing her outfits and taking photographs and videos of her but was otherwise disengaged and disconnected

8

from the child.  The report contrasted the father, who "does make more effort to play at their child's level, but will periodically blow up at the monitor to defend the mother's behavior when the mother is being corrected and/or redirected by the monitor and/or instructor."  The father would try to play with the child and the items she cared about and try to apply what he was taught, including reading to the child and practicing exercises to improve the child's motor skills.  But he also had difficulty understanding the child's behavior, heavily relied on the mother "deciding, acting, and speaking for them," and deferred to her wishes about how to interact with the child.  The report notes the parents "genuinely enjoy seeing" the child and "do express appropriate affection" with her, including kissing and holding her.  But it also states, with our emphasis:  "The minor *is willing to have her parents around* her during in-person monitored visits usually twice a week at the public park, but has become more comfortable to express to them through crying or fussing when she does not want them doing something with her.  *The minor does not show any significant attachment to her parents*."

The case plan update incorporated into the section 366.26 report notes the child was less comfortable with the parents than with her foster parent.  Regarding the mother, this update covers much of the same ground as the section 366.26 report.  It notes the mother opposed the Regional Center's instructions and made the child uncomfortable with all the dress up.  Regarding the father, the update says he "does enjoy his visits with [the child] though he is frustrated that his visits have never been liberalized to unmonitored and has been verbally aggressive in defending the mother when the mother is being corrected, redirected, or given instruction.  He is willing to get [to the child's] level and

9

play with the things the child does show interest in." "Father consistently visits with [the child], but continues to defer parenting to the mother who is more likely to place the minor at risk of harm from swallowing small beads to losing balance and falling down and injuring herself while seated. He tries more of what he is shown to stimulate his daughter's development and interest when compared to the mother." He "remains unwilling to separate himself from the mother to demonstrate his protective capacity."

This reporting satisfied the statute. (See § 366.22, subd. (c)(1).)

We end this section by noting neither parent complained of inadequate reporting before this appeal. (See *In re M.M.* (July 12, 2022, B315997) __ Cal.App.5th __, __ [2022 WL 2679301 at *3] [mother forfeited challenge to adequacy of adoption assessment where she never objected on this basis at the juvenile court]; *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 [parents forfeited claim of deficient report by failing to assert it in the juvenile court].) And while the father testified, neither parent submitted additional evidence or requested a bonding study. In the juvenile court, then, the parents apparently believed the Department's reports were sufficient.

C

The parents had an insubstantial bond with the child.

At the time of the section 366.26 hearing, the child had just turned three. She had spent most of her life in foster care and only the first five or so months of her life with her parents. The child received Regional Center services and was largely nonverbal as of the hearing. She could not "make a meaningful statement" about her feelings for her parents. The section 366.26

10

report shows the child would tolerate her parents during their monitored visits and would play with them, but she was at times uninterested and any attachment they had by this point was not "significant." (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [listing factors for the second prong of the parental-benefit exception]; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316 [no beneficial parental relationship where mother's supervised interactions with child, although frequent and loving, "amounted to little more than playdates for him with a loving adult" and there was no evidence the child looked forward to visits, benefitted from them, or had difficulty separating from his mother].)

This case is unlike *In re J.D.* (2021) 70 Cal.App.5th 833, 855–858 (*J.D.*), cited by the father, where there was considerable evidence the mother and her child had a substantial and positive emotional attachment. The father's other main case, *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229 & fn. 4 (*B.D.*) is similarly distinguishable. (*Id.* at p. 1229 ["our review of the record suggests that the parents presented evidence to support a finding that they had a beneficial relationship with their children"].)

D

The record also shows the trial court did not abuse its discretion in balancing the harms and benefits of adoption. Indeed, the record does not show the child would be harmed by the loss of the largely playmate relationship she had with her parents. On the other hand, the child was joining her half sister in a loving adoptive home with adoptive parents who were motivated to care for her and to provide the services she needed, and the reports of the child's life there were positive. The juvenile court's decision on this third prong certainly was not

11

arbitrary, capricious, or absurd.  (See *Caden C., supra*, 11 Cal.5th at p. 641.)

E

We reject the father's claim the trial court considered impermissible factors in ruling on the parental-benefit exception.

The father says the trial court impermissibly considered whether the parents' role was parental.  The reporter's transcript shows the trial court simply was responding to *the parties'* arguments about the parents and their relationship with their child.  Whether this relationship was one akin to playmates is relevant in assessing the strength of their bond and whether severing it would harm the child.  (See *J.D., supra*, 70 Cal.App.5th. at pp. 864–865 [a relationship involving a substantial, positive, emotional attachment is "surely more significant than that of a 'mere friend or playmate' "]; *B.D., supra*, 66 Cal.App.5th at p. 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate"].)

*Caden C.* does not prohibit such considerations.  (See *J.D., supra*, 70 Cal.App.5th at p. 864 ["*Caden C.* did not address whether, to satisfy the second element, the nature of a parent's relationship must be 'parental' "].)

Context makes clear the juvenile court was responding to the parties.  The court sought to determine the existence and nature of any bond between the parents and the child, as well as any impact of losing this relationship.  The court applied the law thoughtfully and correctly.

The court was not required to make a statement of its findings or reasons.  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156,

12

1161.) The father's frequent criticism of the court's brevity is unfounded.

## DISPOSITION

We affirm.


                                        WILEY, J.

We concur:


GRIMES, Acting P. J.


HARUTUNIAN, J.*

---

*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.